UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:19-CR-583-SRC |
| ) | |
| KYLE GREEN, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

Defendant Kyle Green ("Green"), by and through undersigned counsel, respectfully submits this memorandum to assist this Court in fashioning a sentence that is "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a). Green requests a within-Guidelines sentence of 60 months' imprisonment.

Green stands before this Court extremely remorseful for his conduct and having fully accepted responsibility for the crimes he committed. But as this Court crafts the appropriate sentence in this case, it is Green's devotion to his family, the genuine love and respect he has earned from those who truly know him, and his lifetime of selfless acts that speak to his true character. As the letters from his family and friends demonstrate,[1] Green is a man whose actions reflect his commitment to his family, his faith, and to helping those around him—even when he is suffering. He comes before this Court as a man whose life has been shattered by his actions: his marriage ended and his career, reputation, and family devastated. He recognizes that the blame for that falls squarely on his shoulders and he is admirably in the process of trying to rebuild his life and focus on his future. In that vein, Green's commitment to turning his life around and continuing

---

[1] Consistent with this Court's local rules, the sentencing letters referenced herein are being filed separately but contemporaneously with this memorandum utilizing the applicable CM/ECF designation.

to be there for his family is unmatched. And he is lucky enough to have the support of a committed extended family and community by his side.

As Congress and the Supreme Court acknowledge, this Court is charged with the responsibility of evaluating Green as an individual in crafting an appropriate sentence that is particularly tailored to him. *See Koon v. United States*, 518 U.S. 81, 113 (1996) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue"). Indeed, the Supreme Court has "emphasized that '[h]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.'" *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (citations omitted).

Green accepts that the crimes he committed are serious and this Court must impose a punishment. But in crafting that punishment, Green respectfully requests that this Court consider his lifelong struggles with mental illness and his selfless devotion to his family and all those around him. Against this backdrop, a within-Guidelines sentence of 60 months' imprisonment is "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a).

I. **Procedural Background**

On December 4, 2020, Green will plead guilty to both counts of a superseding information charging attempted receipt of child pornography in violation of 18 U.S.C. §§ 2252A(a)(2)(A) and (b)(1), and interstate travel with the intent to engage in illicit sexual conduct in violation of 18 U.S.C. § 2423(b).[2] Green has been in federal custody since August 8, 2019.

---

[2] In light of the ongoing COVID-19 pandemic, this Court granted a joint motion by the parties to hold a consolidated change of plea and sentencing hearing in this case.

2

On October 29, 2020, the United States Probation Office prepared a disclosure Presentence Investigation Report ("PSR") (Doc. 55). Both Green and the Government filed an acceptance to the PSR. (Docs. 56 and 57). On November 25, 2020, the Probation Office filed its final PSR. (Doc. 59). Sentencing is scheduled for December 4, 2020.

## II.     Legal Standard

As this Court is aware, Congress has mandated that the sentence imposed in this case be "sufficient, but not greater than necessary" to achieve the objectives of punishment. 18 U.S.C. § 3553(a). The United States Sentencing Guidelines, while advisory, "are no longer mandatory." *United States v. Ture*, 450 F.3d 352, 356 (8th Cir. 2006); *see also United States v. Booker*, 543 U.S. 220, 224 (2005).

As the United States Court of Appeals for the Eighth Circuit has established, the methodology this Court should follow post-*Booker* is the following:

> In sentencing a defendant, a district court must first determine the advisory sentencing range as recommended by the Guidelines . . .. Next, the district court should decide if any applicable Guidelines provisions permit a traditional "departure" from the recommended sentencing range . . .. The term "departure" is "a term of art under the Guidelines and refers only to non-Guidelines sentences imposed under the framework set out in the Guidelines" . . .. The calculation of the initial advisory Guidelines range, along with any applicable departures, results in a "final advisory Guidelines sentencing range" . . .. Finally, in determining the actual sentence that should be imposed, a district court must consider whether the factors in 18 U.S.C. § 3553(a) justify a "variance" outside the final advisory Guidelines sentencing range . . .. As opposed to a "departure," a "variance" refers to a "non-Guidelines sentence" based on the factors enumerated in Section 3553(a).

*United States v. Lozoya,* 623 F.3d 624, 625-26 (8th Cir. 2010) (citations omitted).

## III.    Advisory Sentencing Guidelines

Green concurs fully with the final PSR. Specifically, he agrees that the total offense level in this case is 25, his criminal history category is I, and this results in an advisory Guidelines imprisonment range of 57 to 71 months. (Doc. 59 at ¶ 72). Green further concurs that, despite the

3

fact that the low end of the Guidelines imprisonment range is 57 months, Count 2 requires a mandatory minimum term of imprisonment of 60 months and thus the recalculated bottom of the advisory Guidelines range is, therefore, 60 months. (*Id.*).

    **IV.**    **Section 3553(a) Factors**

As a matter of law, this Court must make an individual assessment of the 18 U.S.C. § 3553(a) factors based on all the facts presented. *Gall v. United States*, 552 U.S. 38, 50 (2007). Based upon a consideration of the statutory sentencing factors set out in 18 U.S.C. § 3553(a), a within-Guidelines sentence of 60 months is warranted in this case.

Section 3553(a) sets forth a general directive to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. Section 3553(a) then lists numerous factors that a sentencing court must consider. Especially relevant to this case, and supportive of the argument that a sentence of 60 months is sufficient, are the following factors:

    **A.**    <u>The History and Characteristics of the Defendant – 18 U.S.C. § 3553(a)(1)</u>

Green is a 38-year-old man who is recognized by those who know him best as a man deeply devoted to his family and his faith. While he has struggled with mental health problems from a young age, he has always worked hard to be a trustworthy, reliable, and generous son, brother, uncle, and father.

Green was born in California into a military family, his father having served this country with distinction as a graduate of the Air Force Academy and as a colonel. Thus, as a child, Green moved frequently—regularly having to change schools and adjust to new communities. As with many military families, this was not easy for the children. And for someone with mental illness, the challenge was even greater. As Green's brother, Kevin, reflects, "Kyle would again be a new kid in a new town, starting eighth grade at a new middle school where cliques from seventh grade

4

had already formed and would prove difficult for Kyle to infiltrate. Kyle soon entered high school, and as the years passed, he seemed increasingly lonely in a way that I could not help alter." *See* Letter from Kevin Green.

Eventually, Green's family settled in O'Fallon, Illinois where he was raised in a stable and loving home. Green remains extremely close with his family and they continue to stand by his side, offering their support. Indeed, prior to being arrested in this case, Green resided at his parents' home and his parents and siblings look forward to the day that he gets to come back home.

Green has struggled with mental health from a young age. As a teenager, Green began treatment and medication. At many times in his life, Green sought and benefited from treatment and would, as the final PSR correctly notes, benefit from mental health treatment during any period of incarceration and/or supervised release ordered by this Court. But as with many people struggling with mental health, the road for Green had its obstacles. As Green's father explains, "[m]ental illness began to impact his life in his high school years. We sought professional help and tried to understand what was happening to him. We all learned a lot about the devastating impact of mental illness on a person and family." *See* Letter from William Green. And as Green's pastor since childhood observes, "Late in his teenage years Kyle came to talk with me and I do not feel I am breaking a confidence when I say that I saw signs of significant anxiety and the beginnings of mental illness. I have been a priest for 53 years and I have had much experience with those suffering from emotional and mental illness." *See* Letter from Monsignor William Hitpas. Green's brother describes what he observed through the lens of a younger child—and, in particular, the evolution he observed in his older brother's struggles. *See* Letter from Kevin Green. The details and severity of Green's mental health history are set out in the PSR and in the letters submitted for this Court's consideration.

5

Courts have long recognized mental health as a ground for a reduced sentence—even in some cases as a basis for a below-Guidelines sentence. *See, e.g., United States v. Ferguson*, 942 F. Supp. 2d 1186, 1194 (M.D. Ala. 2013) ("in accordance with the policy directives of the sentencing guidelines, the court decided to vary downwards one level for the specific purpose of allowing Ferguson to receive mental-health treatment outside of prison, a course that will not only benefit Ferguson but will also better promote public safety and well-being"); *United States v. Flowers*, 946 F. Supp. 2d 1295, 1300 (M.D. Ala. 2013) ("the court reasoned that a lengthy sentence of probation coupled with a mandatory condition of participation in mental-health treatment would best accomplish the goal of addressing the root cause of Flowers's criminality—her mental illness. A downward variance in this case was thus warranted in order to achieve 'a specific treatment purpose' and is in line with the Sentencing Commission's recent redirection on factoring mental health into the determination of a reasonable sentence'"); *United States v. Robinson*, 778 F.3d 515, 523 (6th Cir. 2015) (citing *Gall*, 552 U.S. at 50) ("Defendant's contentions regarding mental illness, if credible, could qualify as a compelling justification that may support a significant downward variance from the Guidelines range"); *United States v. Mendez*, 284 F. App'x 653, 661 (11th Cir. 2008) ("the record does not show that the district court made a clear error in judgment in giving only a modest sentence reduction for Mendez's mental problems").

While Green's struggles with mental health have been lifelong, what stands out about Green is that those struggles have not stopped him from being an invaluable member of his family and from contributing to his community. As Green's sister explains, Green is a good and responsible father and took on the added responsibility of caring for a family member with special needs—devoting his "weekends he had off from work" and "illustrat[ing] Kyle's integrity as he could have easily spent his days off engaged in more relaxing activities." Green's "compassion is

6

a gift. He is accepting of those who have different views than him and of those who struggle, especially with people who feel unworthy or out of place." *See* Letter from Heather Mooney.

Those who know Green best describe him as a devoted member of his church who always jumps at the opportunity to help those less fortunate than himself. Indeed, even as he has spent the past 15 months in jail, Green has sought to help those with whom he has come into contact. While in custody, Green has volunteered his time to tutor fellow inmates.

To be clear, Green and the crime he committed present a paradox. He is an intelligent, charitable, good person who has always been there for his family and his community, he has held stable employment in the healthcare field, and—in his late thirties—this is Green's first and only run-in with the justice system (with the small exception of stealing an adult magazine as a teenager). By all appearances, this was a man whose life—personally and professionally—has been a success. On the saxophone and the piano, Green made songs come to life; at his brother's wedding, it was Green "playing the saxophone as [Kevin] walk[ed] down the aisle," and at his grandparents' funerals, it was Green "playing Ave Maria." *See* Letter from Kevin Green. He worked through course after course at community college to finally earn a degree that would enable him to help others in need in the healthcare field.

But beneath the surface, this is a man who has struggled with mental illness and whose struggles overtook him during critical periods of his life including times that bring him before this Court for sentencing. This is not an excuse for Green's conduct, but it is an explanation—and it provides a compelling basis for this Court to temper a more severe sentence with mercy and a focus on mental healthcare and rehabilitation that can be achieved outside of a prison environment. Indeed, Green has shown firsthand that even when it is harder for him than others, he can overcome his struggles. As his brother describes, "It took many, many years—taking one or two courses at a

time while working multiple jobs and being a dad—but Kyle finally graduated and found work in the medical field." *See* Letter from Kevin Green.

Indeed, Green's demonstrated track record of charitable acts and good citizenship even further warrant a within-Guidelines sentence of 60 months. Federal courts routinely recognize a defendant's record of charity and benevolence as warranting reduced sentences. Perhaps most notably, the United States Court of Appeals for the Seventh Circuit recently affirmed a probation sentence to H. Ty Warner for evading $5.6 million in federal taxes by hiding assets in a Swiss bank account. *See United States v. Warner*, 792 F.3d 847, 850 (7th Cir. 2015). The sentencing court acknowledged Warner's "private acts of kindness, generosity and benevolence" and emphasized that "many of them took place long before Warner knew he was under investigation." *Id*. at 854. While the crimes Green and Warner committed were admittedly different, the bottom line is that Green too—long before the conduct that brings him before this Court—lived his life with genuine and sincere kindness, generosity, and charity in the most meaningful way: he was not in a position to write a check to help others, so he did it the old-fashioned way, by rolling up his sleeves with hard work and dedication.

The bottom line is that Green's family and friends—the people who know him best—remain extremely supportive while fully aware of the crimes that bring him before this Court, and that speaks to the character of any person. Green has the support that will enable him to make the most of the rest of his life. This is not a defendant who will reoffend.

    B.  <u>Other Section 3553(a) Factors</u>

This Court must fashion a sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public from future crimes, and to provide a defendant with necessary treatment. 18 U.S.C. § 3553(a)(2).

A sentence of 60 months' imprisonment—which effectively represents a sentence *greater than* the bottom of the advisory Guidelines range (57 months) without consideration of the mandatory minimum—accomplishes these sentencing objectives.

In that regard, it is fair for this Court to consider that while Green fully concurs with the Guidelines calculations set out in the final PSR, the reality is that many courts and scholars have long noted that the Guidelines applicable to child pornography charges in particular are excessively harsh. When Chief United States District Judge M. Casey Rodgers testified before the United States Sentencing Commission in February 2012, she explained that she and the other judges in her district "most often" concluded that the recommended guideline range was consistent with the factors set out in 18 U.S.C. § 3553(a). *Statement of Chief United States District Judge M. Casey Rodgers before the United States Sentencing Commission* (Feb. 15, 2012), at 1-2.[3] However, she testified that this was "not the case in the area of child pornography offenses," noting that many district court judges are "increasingly imposing below-guideline sentences based on a concern over the integrity and reliability of [the child pornography] guidelines." *Id*. at 3. The central flaw, she noted, is that "the cumulative effect over time from Congress's directives, direct amendments, and the enactment of a mandatory minimum for receipt, coupled with the Commission's efforts to comply with those directives" has been "ever increasing sentences...that ferries the ordinary offender to the high end of the statutory sentencing range." *Id*. at 7. In particular, the "specific" offense characteristics that result in higher sentences are not so specific—rather, they are found in nearly every case. *Id*. at 7-10.

Judge Rodgers is not alone in her observations. She is joined by numerous federal district and appellate courts—and even by the United States Sentencing Commission itself. As the United

---

[3] Available at: https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20120215/Testimony_15_Rodgers.pdf (last accessed November 25, 2020).

9

States Court of Appeals for the Second Circuit observed with respect to the child pornography Sentencing Guidelines applicable in this case, the guideline "is fundamentally different from most in that, unless applied with great care, [it] can lead to unreasonable sentences that are inconsistent with what section 3553 requires." *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010).

In this case, Green received enhancements for that count (the two counts group together as reflected in the final PSR) because he used a computer and because the images involved sadistic or masochistic conduct as defined by the Guidelines. (*See* Doc. 59 at ¶¶ 31 and 32). But, as the Second Circuit importantly recognized, these enhancements that increase Green's advisory Guidelines range by 6 offense levels apply in the overwhelming majority of cases:

> many of the § 2G2.2 enhancements apply in nearly all cases. Of all sentences under § 2G2.2 in 2009… 97.2% involved a computer (qualifying for a two-level increase pursuant to § 2G2.2(b)(6)) [and] 73.4% involved an image depicting sadistic or masochistic conduct or other forms of violence (qualifying for a four-level enhancement pursuant to § 2G2.2(b)(4))[.]

*Id*. at 186. Making matters worse, these enhancements are stacked on top of an already drastically increased base offense level for receipt of child pornography. Specifically, in 1991, the base offense level for this offense was 13—but today it is 22. *Id.* The gradual increase of the base offense level for this charge, as federal courts have aptly recognized, was not the result of research or empirical evidence but was, rather, the result of the Sentencing Commission's well-intentioned, but problematic, attempt "to square the Guidelines with Congress's various directives." *Id.*; *see also United States v. Phinney*, 599 F. Supp. 2d 1037, 1042-43 (E.D. Wis. 2009).

What is particularly notable and unusual is that the Sentencing Commission openly and adamantly opposed many of the changes directed by Congress—and, in particular, some of the enhancements applicable to Green. *See, e.g., United States v. Stern*, 590 F. Supp. 2d 945, 960 (N.D. Ohio 2008) (internal citations omitted):

10

> The Court is particularly troubled that the Guidelines for sentencing those who possess child pornography "have been repeatedly raised despite evidence and recommendations by the [United State Sentencing] Commission to the contrary." Indeed, "[t]he most recent changes [to the Guidelines] apparently came from two lawyers in the Justice Department who persuaded a novice Congressman to add them to the popular Amber Alert bill." ... this Court concludes that "the guideline provisions relating to child pornography offenses of this nature do not reflect the kind of empirical data, national experience, and independent expertise that are characteristic of the Commission's institutional role."

Perhaps most astutely, the Second Circuit in *Dorvee* drew a parallel between the Guidelines applicable in this case and the analysis employed by the United States Supreme Court with regard to the crack cocaine Sentencing Guidelines:

> In keeping with these principles, in *Kimbrough,* the Supreme Court held that it was not an abuse of discretion for a district court to conclude that the Guidelines' treatment of crack cocaine convictions typically yields a sentence "greater than necessary" to achieve the goals of § 3553(a), because those particular Guidelines "do not exemplify the Commission's exercise of its characteristic institutional role." *Kimbrough,* 552 U.S. at 109–10. As we have explained here, the same is true for the child pornography enhancements found at § 2G2.2. Following *Kimbrough,* we held that "a district court may vary from the Guidelines range based solely on a policy disagreement with the Guidelines, even where that disagreement applies to a wide class of offenders or offenses." *Cavera,* 550 F.3d at 191. That analysis applies with full force to § 2G2.2.

*Dorvee*, 616 F.3d at 188.

Because the majority of the enhancements which drive Green's advisory Sentencing Guidelines range upwards apply in virtually every child pornography case, they have absolutely no unique significance to the punishment decision in this case and contravene what Section 3553(a) statutorily requires.

Specifically, in this day and age, the fact that an offender convicted of child pornography offenses did so through the use of a computer is meaningless. Even in 2009—and computers and mobile electronic devices have only become more ubiquitous since then—97.2% of offenders sentenced for child pornography offenses received the use of a computer enhancement. *See*

11

*Dorvee*, 616 F.3d at 186. The fact that Green used a computer has no significance.

With respect to the enhancement for material depicting sadistic or masochistic conduct, the justification can only be that such images cause more harm to the victims of child pornography. But while that would perhaps be understandable, the interesting reality is that is actually not the purpose for which the enhancement was promulgated. As the United States Court of Appeals for the First Circuit explained,

> That an image 'portrays sadistic or masochistic conduct' does not require that it depict actual sadistic conduct; if that were the Sentencing Commission's intent, there would be express language to that effect. The language it did choose is to the contrary. Webster's Third New International Dictionary defines 'portray' as 'to represent by drawing, painting, engraving,' 'to describe in words,' and to 'enact.' The Guidelines simply do not require the image to be an accurate documentation of real sadistic conduct.

*United States v. Hoey*, 508 F.3d 687, 692 (1st Cir. 2007). In other words, the purpose behind the enhancement was predicated on the notion that an image that *portrays* sadistic conduct justifies a more severe sentence, regardless of whether sadistic conduct ever actually occurred.

Ultimately, the result of the compilation of values assigned to the offense characteristics in Green's case—which are largely the same ones found in all child pornography cases—results in an advisory Guidelines range drastically higher than without the "specific offense characteristics" being included.

Green does not dispute that 60 months' imprisonment is the minimum allowable sentence in this case—and that is the within-Guidelines sentence he expressly asks this Court to impose. However, even today—pursuant to the drastically-increased base offense level and "specific" offense characteristics (that apply in virtually all cases)—a sentence of 60 months is greater than the low end of the advisory Guidelines range of punishment. If the "specific" offense characteristics enhancements (that apply in virtually all cases) were not applied and Green was

credited with acceptance of responsibility reductions, the total offense level would be 19, resulting in a Guidelines range of 30 to 37 months. And if Green had been sentenced for his crimes in 1991 as opposed to 2020, a base offense level of 13, reduced for acceptance of responsibility, would result in a Guidelines range of 6 to 12 months' imprisonment. Through that lens, the sentence requested by Green—60 months—is fair but, by no means, lenient. Rather, it is sufficient, but not greater than necessary, which is precisely what the law requires.

Despite the courts' and the government's most well-intentioned and aggressive efforts, in cases such as this, the ever-increasing prison sentences meted out since the 2003 amendments to the Sentencing Guidelines have had no discernable impact on deterring the exponential growth of the problem. *See* Motivans, M. & Kyckelhahn, T, Bureau of Justice Statistics Special Report, Federal Prosecution of Child Sex Exploitation Offenders, 2006.[4] The United States Department of Justice itself acknowledged that "prison sentences are unlikely to deter future crime" and that "prisons actually may have the opposite effect." "Five Things About Deterrence," U.S. Department of Justice (July 2014). Based on the Department of Justice's research, "Increasing the severity of punishment does little to deter crime." *Id*.

To be clear, while no one seeks to minimize the seriousness of the crimes for which Green is being sentenced, it is important for this Court to fully consider a full picture of Green's character and the bases—legal and factual—that warrant the sentence Green is requesting.

The bottom line is that with a lifetime of sex offender registration requirements and the inherent shame and humiliation that comes with this history in a Google era, Green will have to suffer the consequences of his crimes for the rest of his life—regardless of how long he is in prison. *See, e.g., United States v. Nesbeth*, 188 F.Supp.3d 179, 188 (E.D.N.Y. 2016) (noting that collateral

---

[4] Available at: https://www.bjs.gov/content/pub/pdf/fpcseo06.pdf (last accessed November 25, 2020).

consequences may be considered as bearing on just punishment and accordingly factoring such consequences into a Section 3553(a) analysis). The fact that he will be a registered sex offender carries with it severe punishment. The ramifications of supervised release, and the corresponding limitations on his freedom, are intrinsically punitive and, in some ways in the context of convicted sex offenders, are actually worse than jail. And, in the midst of the ongoing COVID-19 pandemic, the time in custody is that much harder because in-person visits are impossible at certain times and very difficult at others.

A sentence of 60 months undoubtedly reflects the seriousness of the offense, promotes respect for the law, provides just punishment, affords adequate deterrence, and protects the public from future crimes. And, in this case, a sentence of 60 months is sufficient, but not greater than necessary—and that is what the law requires.

**V.     Conclusion**

As the age-old adage goes, "justice must be tempered with mercy." Green accepts that he is before this Court for sentencing for serious crimes and that this Court must impose a penalty. That is justice. But Green also appeals to this Court's discretion to temper that justice with mercy.

One of the toughest realities to accept at any age is that, as humans, we cannot go back in time to make better decisions. We have to accept the decisions we make and the consequences of those decisions. But if ever there were a defendant standing before this Court who is as remorseful as he is committed to never finding himself anywhere close to this situation again, it is Green. As his brother, Kevin, shares, "Kyle has recognized the pain and grief he has caused. He has shared with me the fear he feels about the future and also shared with me his acceptance of the consequences for his actions." *See* Letter from Kevin Green. As he moves forward into the next chapter of his life, Green continues to have so much good to offer the world. As his brother said,

14

"I have so many more memories of joy and love because of Kyle." *See id*. And that is a strong testament to Green's true character and the impact he has on those around him.

For all the reasons set forth in the PSR, in this memorandum, and in the numerous letters submitted for this Court's consideration, Green asks this Court to impose a within-Guidelines sentence of 60 months. Under the circumstances of this case, such a sentence will be sufficient to satisfy all the purposes of sentencing and is appropriate under Section 3553(a).

Respectfully submitted,

**Margulis Gelfand, LLC**

*/s/ Justin K. Gelfand*
JUSTIN K. GELFAND, # 62265
WILLIAM S. MARGULIS, #37625
8000 Maryland Avenue, Suite 420
St. Louis, MO 63105
Telephone: (314) 390-0234
Facsimile: (314) 485-2264
justin@margulisgelfand.com
bill@margulisgelfand.com
**Attorneys for Green**

**Certificate of Service**

I hereby certify that the foregoing was filed electronically with the Clerk of the Court, and that all parties will receive notice of this filing through this Court's electronic filing system.

>   */s/ Justin K. Gelfand*
>   JUSTIN K. GELFAND, # 62265
>   WILLIAM S. MARGULIS, #37625
>   8000 Maryland Avenue, Suite 420
>   St. Louis, MO 63105
>   Telephone: (314) 390-0234
>   Facsimile: (314) 485-2264
>   justin@margulisgelfand.com
>   bill@margulisgelfand.com
>   ***Attorneys for Green***